UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No. 2:13-CR-154 |
| *Plaintiff*, | : | JUDGE EDMUND A. SARGUS, JR. |
| v. | : | |
| **ALONSO TORRES,** | : | |
| *Defendant.* | : | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE/HOME CONFINEMENT**

The defendant's motion for compassionate release should be denied on the merits because deference should be paid to the Bureau of Prisons judgment as to which inmates meet the extraordinary and compelling justifications for compassionate release.

## LAW

Accepting Mr. Torres's filing as true, it appears that Mr. Torres has satisfied the exhaustion requirement under 18 U.S.C. §3582(c)(1)(A), as modified by the First Step Act of 2018. However, it is the United States, position that the Court should defer to the judgment of the BOP on matters of compassionate release and home confinement and Mr. Torres' motion should be denied.

## ARGUMENT

**A.  The BOP Has Undertaken Extensive Efforts to Protect Inmates From Exposure to COVID-19.**

Much COVID-19 litigation throughout the United States, including within the Sixth Circuit, has progressed over the last nine months and added considerable information to the public's knowledge about the steps that the BOP has taken to prevent the spread of COVID-19,

and the Congressional and Attorney General authority which has been extended to give the BOP greater flexibility in considering compassionate release requests.[1]  In response to the pandemic, the BOP began a phased approach nationwide. Phase One of its action plan began in January 2020 and involved creating a strategic response plan.

On March 13, 2020, the BOP implemented Phase Two, which suspended social and legal visits, inmate facility transfers, staff travel and training, contractor access, and volunteer visits. Elkton began implementing Phase Two health screening of arriving inmates and staff for COVID-19 symptoms and risk factors on March 22. Additionally, the BOP modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures. Phase Three involved inventorying the BOP's cleaning, sanitation, and medical supplies. In Phase Four, beginning on March 26, the BOP expanded its initial screening procedures to mandate use of a screening tool and temperature check, and require asymptomatic arrivals to be placed in quarantine for fourteen days and symptomatic arrivals to be isolated until they tested negative for COVID-19 or were cleared by medical staff. On March 31, the BOP implemented Phase Five.

Phase Five required all inmates to be secured to their quarters for a fourteen-day period with limited access to the commissary, laundry, showers, telephone, and other services. The BOP also coordinated with the U.S. Marshals Service to decrease incoming arrivals during this period. Phase Six, ordered on April 13, extended Phase Five through May 18.  On Monday, May 18, 2020, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 7 of its COVID-19 Action Plan. This phase extends all measures from Phase 6, to include measures to contain movement and decrease the spread of the virus.

---

[1] Most of the information presented here in reference to BOP actions comes from the recent case of *Wilson v. Torres*, 2020 U.S. App. LEXIS 18087, 20a0179p.06 (6th Cir. June 9, 2020).

In addition to complying with nationwide directives, BOP facilities have provided inmate and staff education through Frequently Asked Questions bulletins, provided staff training on using Personal Protective Equipment, ordered enhanced cleaning, and took other preventative measures, including daily temperature screening of inmates, enhanced screening before and after assigned work details, and ensuring that all inmates have access to sinks, water, and soap at all times and may receive new soap weekly or upon request.

In addition to all of these extensive measures, Congress and the Attorney General have also expanded the BOP's discretion in considering compassionate release/home confinement requests. For example, the CARES Act recently expanded the power of the Bureau of Prisons to "place a prisoner in home confinement" as an alternative to compassionate release. Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020).  The Attorney General has also instructed the Bureau of Prisons to make the most of this expanded power by placing in home confinement "all inmates whom [the Bureau] deem[s] suitable candidates." Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, Office of the Attorney General (Apr. 3, 2020).

It is important that some perspective is brought to bear on how well it has been managed by the BOP.  Looking at the actual numbers strongly supports that the BOP has done an exceptional job handling the COVID-19 pandemic.  In March of 2020, the BOP housed approximately 165,000 federal inmates in BOP-managed institutions and 13,436 in community-based facilities. As of December 14, 2020, the BOP has 124,575 federal inmates in BOP-managed institutions and 14,090 in community-based facilities. The BOP staff complement is approximately 36,000. There are 5,002 federal inmates and 1,564 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 22,146 inmates and 2,070 staff have

recovered. There have been 149 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19 disease. Of the inmate deaths, 4 occurred while on home confinement. (See https://www.bop.gov/coronavirus/ last visited on March 5, 2021). While those 149 deaths are unquestionably tragic, they represent only a fraction of the approximately 200,000 inmates cared for, kept healthy, or returned to health by the BOP.  Far from striking an ominous tone, the actual numbers demonstrate that the BOPs care for the health and safety of inmates such as Mr. Torres during nearly nine months of a world-wide pandemic has been exceptional.

Last year, in a comprehensive opinion in Case No. 20-3447, *Craig Wilson, et al v. Mark Williams, et al*, Originating Case No. : 4:20-cv-00794, the Court of Appeals explained:

> [T]he BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk. . . . We conclude that petitioners have not provided sufficient evidence to show that the BOP was deliberately indifferent to the serious risk of harm presented by COVID-19 at Elkton. This conclusion is dispositive.

(*Id*.)

Additionally, the BOP have now put in place a robust vaccination program.  According to the best available information, As of February 22, 2021, 52,534 total doses of the vaccine have been administered and every location within the Bureau has received the first dose of the vaccine. Seventy locations have received second doses. As a result, 11,233 staff and 8753 inmates are now fully inoculated. (https://www.bop.gov/resources/news/20210223_vaccination_status.jsp.)

Thus, as the U.S. Courts have been asked to weigh-in on the BOP's efforts, as in the case at FCI Elkton, they have found that the BOP is taking significant measures to protect the health

4

and safety of inmates. The evidence is thus clear that the overall performance in response to the COVID-19 pandemic by the BOP has been admirable.

> **B.  The BOP is Best-Positioned to Make Decisions About The Compassionate Release of Inmates Such as Mr. Torres.**

In order to assist inmates who are most vulnerable to the virus and pose the least threat to the community, the BOP is also exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the Centers for Disease Control (CDC) risk factors. A subsequent memorandum from the Attorney General further directed the BOP to expand the range of inmates eligible for home confinement, as authorized by the CARES Act. See Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted March 27, 2020.

In assessing whether home confinement is appropriate for a particular inmate, the BOP weighs numerous factors, including the inmate's medical condition, age, crime of conviction, and conduct while in prison; conditions in the inmate's particular institution; availability of post-release transportation, housing, and supervision for the inmate; and the inmate's risk from COVID-19 if released. Prior to releasing an inmate, the BOP is directed to implement a 14-day quarantine in order to protect the community.

The BOP is devoting all available resources to executing the Attorney General's directives, and has been aggressively and systematically assessing the inmate population to determine which prisoners are most appropriate for transfer. In March of 2020, the BOP inmate population exceeded 165,000 inmates. In response to COVID, the BOP has reduced the inmate population to 125,002 federal inmates in BOP-managed institutions and 13,810 in community-

based facilities. The BOP staff complement is approximately 36,000. There are 674 federal inmates and 1,535 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 47,059 inmates and 5,051 staff have recovered. There have been 225 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. (*See* www.bop.gov/coronavirus (last accessed on March 15, 2021).

The BOP's home confinement program provides a centralized, consistent mechanism for identifying prisoners for whom home confinement is most appropriate.  The resulting reduction in prison population will in turn benefit all remaining inmates.  Here, pursuant to the direction from Congress and the Attorney General, the BOP reviewed Mr. Torres's request, his medical records, the particulars of his offense and substantial criminal record – which include multiple narcotics trafficking and firearm convictions – and the risk he would pose to the community if released, and concluded that he did not meet their criteria for compassionate release or a reduction in his sentence.  Courts should hesitate to disrupt this systematic effort by granting compassionate release to prisoners who may be less deserving than others nationally, and without the capacity to conduct the comprehensive and consistent review that can be undertaken by the BOP.

This Court should defer to the BOP's judgment as to which inmates meet the criteria for and are most deserving of compassionate release.

      **C.**    **The BOP has the sole discretion to Place Mr. Torres in Home Confinement.**

To the extent that Mr. Torres is seeking relief separate and apart from compassionate release under section 3582(c)(1)(A), his request that he be released to home confinement fails because it is well-established that a district court lacks the authority to determine where an inmate is confined.  Instead, under federal law, "[t]he Bureau of Prisons shall designate the place

of the prisoner's imprisonment." 18 U.S.C. § 3621(b).  Courts have repeatedly stated that the BOP alone has this authority.  *See*, *e.g.*, *United States v. Townsend*, 631 Fed. App'x 373, 378 (6th Cir. 2015) ("The BOP, not the court, is responsible for designating the place of a prisoner's imprisonment."); *United States v. Jalili*, 925 F.2d 889, 892 (6th Cir. 1991) ("Section 3621(b) gives the Bureau of Prisons the power to designate the place of confinement for anyone sentenced to a term of imprisonment."); *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) ("While a district court judge has wide discretion in determining the length and type of sentence, the court has no jurisdiction to select the place where the sentence will be served. Authority to determine place of confinement resides in the executive branch of government and is delegated to the Bureau of Prisons.") (citation omitted).

In short, the BOP "has the sole discretionary authority to designate an inmate's federal place of imprisonment." *Baldwin v. Warden, Madison Corr. Inst.*, No. 1:17-CV-686, 2018 U.S. Dist. LEXIS 131725, at *5 (S.D. Ohio. Aug. 6, 2018). Courts have repeatedly ruled that the outbreak of COVID-19 does nothing to change this analysis.  Even during the pandemic, BOP retains the sole discretion and jurisdiction to order the BOP to transfer Mr. Torres to home confinement as "the authority to make this determination is squarely allocated to the Attorney General, under whose authority is the Bureau of Prisons." *United States v. Doshi*, No. 13-CR-20349, 2020 U.S. Dist. LEXIS 55572, at *2 (E.D. Mich. Mar. 31, 2020); see Dougherty, 2020 U.S. Dist. LEXIS 68725, at *5 ("It is the Bureau of Prisons, not this court, which has the authority to designate the place of a prisoner's confinement."); *Miller v. United States*, No. 16-20222-1, 2020 U.S. Dist. LEXIS 62421, at *4 (E.D. Mich. Apr. 9, 2020) ("[T]his Court and others have recognized that the authority to place a prisoner in home confinement is given to the BOP, through Attorney General delegation[.]").

7

Accordingly, to the extent Mr. Torres's motion could be treated as a motion for home confinement, it should be denied on those grounds for the reasons stated above.

## CONCLUSION

It remains the position of the United States that the BOP is taking extensive measures and precautions to keep inmates like Mr. Torres safe and healthy and the BOP is best positioned to assess the many relevant factors including risks to the defendant in his or her current placement, risks to the community from release, existence of an appropriate release plan, and needs for pre-release quarantine.  For all of these reasons, the United States' position is that the Court should defer to the judgment and expertise of the BOP and Mr. Torres's motion for compassionate release and/or home confinement should be denied.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/Michael J. Hunter
MICHAEL J. HUNTER (0076815)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Email: michael.hunter@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing motion was filed with the Court's CM/ECF filing system and Mr. Torres's appointed counsel, Joseph Edwards, Esq. on this 15th day of March 2021.

s/Michael J. Hunter  
MICHAEL J. HUNTER (0076815)
